UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
NANCY ENOKSEN,

                              Petitioner,

                  -against-                                **MEMORANDUM AND ORDER**
                                                              19-CV-7315 (GRB)

SUPERINTENDENT SQUIRES, ALBION
CORRECTIONAL FACILITY,

                             Respondent.
------------------------------------------------------------------X
**APPEARANCES:**

Nancy Enoksen
            *Pro se Petitioner*

Cristin N. Connell, Assistant District Attorney
Nassau County District Attorney's Office
262 Old Country Road
Mineola, NY 11501
            *Attorneys for Respondent*

**GARY R. BROWN, United States District Judge:**

       In a criminal prosecution, a jury may (and often should) be instructed that a non-testifying

defendant has *a right not to testify* and that no inference should be drawn from the exercise of that

right. Is it sufficient, then, as happened in this case, to charge a jury that such a defendant had *a*

*right to testify*, and that no inference should be drawn from fact that she "did not do so"? And can

such an instruction be given absent a request from or, indeed, over the objection of, the defendant?

       These represent the more substantial questions presented by the instant petition for habeas

corpus, brought by Nancy Enoksen ("Petitioner"). On January 29, 2018, following a jury trial,

Petitioner, a former lawyer, was convicted of one count of Grand Larceny in the Second Degree

based upon the pilfering of $187,000 from one of her client's escrow accounts. On March 20,

2018, Petitioner was sentenced to an indeterminate sentence of three and one-third to ten years of

imprisonment.  Following exhaustion of a number of state appellate remedies, she now brings the instant petition.

While the answers to the above questions are nuanced and interesting, as set forth below, though erroneous, the challenged instruction does not appear to provide grounds for relief under existing law.  Because neither these contentions, nor the other arguments posited here, warrant the extraordinary relief sought, the petition is denied for the reasons set forth herein.

## I. FACTUAL BACKGROUND

The following facts are taken from the petition and the state court record.[1]

Petitioner was a matrimonial attorney with a legal practice in Nassau County.  Tr. 237-38. In 2008, Lisa Elfante retained Petitioner to represent her in her divorce proceeding.  *Id.*. 238. During the course of her divorce proceedings, Elfante was seriously injured in an automobile accident.  *Id.* 240.  Thereafter, Elfante sued and received a settlement of approximately $417,720 as a result of that lawsuit.  *Id.* 241.  Elfante told Petitioner that she was concerned about a potential deficiency judgment against her resulting from the short sale of her former martial home, so Petitioner offered to hold Elfante's settlement money in an escrow account to protect it.  *Id.* 244-46, 429, 465.  After depositing Elfante's settlement funds into an escrow account, Petitioner purloined approximately $187,000.00 from the account between August 2013 and April 2014, which she converted to her own use.  Tr. 263-93, 365, 491; People's Exhibit ("P. Ex.") 2B, DE 15-11.

---

[1] "Tr." refers to the trial transcript (Trial Tr., *People v. Enoksen* (Jan. 16-17, 23-25, 29 2018)), Docket Entries (D.E.) 15-4 – 15-9.  "S." refers to the transcript for the sentencing proceedings (Sentencing Tr., *People v. Enoksen* , (March 20, 2018)), D.E. 15-10.

Prior to trial, the defense sent the prosecution a letter requesting all of Elfante's "therapy records." *See* September 16, 2016 Letter, D.E. 2-9. The prosecution informed defense counsel that it was not in possession of or even aware of any such records. *See* Respondent's Affidavit and Memorandum of Law in Opposition to Petition for Writ of Habeas Corpus ("Resp.'s Aff. and Mem. in Opp."), D.E. 15, at 2. Thereafter, in December 2016, defense counsel filed a motion seeking that the court "so order" a subpoena duces tecum for Elfante's medical and psychiatric records, which the court denied. *See* May 15, 2017 Dec. and Order, D.E. 15-3. The court ruled that the subpoena was overbroad and there was not a factual predicate warranting production of the records. *Id.* At trial, the court precluded defense counsel from questioning Elfante regarding mental health treatment, finding that defense counsel failed to provide a factual basis sufficient to support the line of questioning. Tr. 394-97.

Elfante testified that Petitioner had her sign a retainer agreement ("the agreement") prior to entering into the escrow arrangement. *Id.* 244-45. Elfante's daughter worked for Petitioner and brought the agreement home to Elfante to sign. *Id.* After reviewing the agreement, Elfante observed that it was the same as the retainer agreement she signed for her divorce, so she called Petitioner. *Id.* 245. Petitioner explained to Elfante that the agreement was merely a technicality required to open the escrow account and instructed her to sign it. *Id.* However, the agreement gave Petitioner sole discretion to take "necessary and appropriate" actions to protect Elfante's interests, and Petitioner had control over the checkbook for the escrow account. *Id.* 253-54, 372.

Petitioner opened two escrow accounts on behalf of Elfante. The first account, ending in 4159, was opened at TD Bank but was later closed by Petitioner at Elfante's request because the account used Elfante's married name and address. *Id.* 248-52. According to Elfante, there were no unauthorized withdrawals from that account. *Id.* 250-52. After closing the 4159 account,

Petitioner opened a new TD Bank account ending in 3979, under the name "Lisa Marie Elfante Escrow Account, Law Office of Nancy Enoksen."  Tr. 253-55, 483.  Petitioner never sent Elfante a monthly statement of the balance of the 3979 account, and only once provided a written description of the account activity after numerous requests by Elfante.  *Id.* 295-96.  That written breakdown, provided to Elfante sometime in the Fall of 2013, listed only two withdrawals, a check to Petitioner in the amount of $10,533.00 representing outstanding legal fees accrued during the matrimonial action, and a $3,500 withdrawal Elfante authorized in September 2013.  *Id.* 295-97, 299; P. Ex. 29, D.E. 15-13.  The breakdown did not include $70,000 Petitioner withdrew from the account, and stated that the account balance was $362,677.91.  Tr. 297, 670-71; P. Ex. 29, D.E. 15-13.  According to the bank records also admitted at trial, the balance of the escrow account at the close of September 2013 was, in fact, $277,679.30.  P. Ex. 2B, D.E. 15-11.

After receiving the handwritten accounting from Petitioner, Elfante sent Petitioner numerous text messages requesting information regarding the escrow account, the majority of which were unanswered.[2]  Tr. 311-39, 464; P. Ex. 32, D.E. 15-14.  In April 2014, after Elfante sent Petitioner multiple text messages inquiring about the account, Petitioner sent Elfante a text stating "[s]eriously, Lisa, cut me a break here.  I did this for you.  There is nothing in it for me except I am sure I wasn't allowed to do this.  Yet you act like I'm working for you or something."  Tr. 332, P. Ex. 32, D.E. 15-14.  After further text messages were exchanged, Petitioner agreed to meet with Elfante to provide bank records but never followed through.  Tr. 334-39.

---

[2] Defense counsel objected to the text messages being introduced as evidence, arguing that they were not the best evidence and could not be properly authenticated.  Tr. 29-34, 275-85, 320-22.  The text messages were reproduced and contained in a six-page document which included Elfante's handwritten notes.  P. Ex. 32, D.E. 15-14.  Ultimately, the trial court overruled defense counsel's objection and allowed the text messages into evidence finding that defense counsel's argument went to the document's weight, not its admissibility.  Tr. 275-86.  Additionally, defense counsel requested a missing evidence instruction to the jury.  *Id.* 286-87.  The trial court stated that it would consider the application after the close of the prosecution's case.  *Id.* 287.  Defense counsel did not renew the request for the missing evidence charge.

In May 2014, Elfante went to TD Bank to get information about her escrow account, but was informed by the bank representative that she had no authority to get such information.  *Id.* 360-61.  Thereafter, Elfante obtained a signed check from Petitioner and brought it back to TD Bank, where she met with a different bank representative.  *Id.* 361-62.  The bank representative advised Elfante of the balance in the escrow account and printed the bank statements for the account.  *Id.* 362-63.  Reviewing the bank statements, Elfante observed numerous negotiated checks payable to Petitioner.  *Id.* 363-64.  On May 6, 2014, Elfante liquidated the account by writing a check in the amount of $120,296.29.  *Id.* 364.

Ramona Duran, an investigative accountant with the Nassau County District Attorney's Office, analyzed the 3979 account and provided testimony and demonstrative evidence summarizing the activity in the account for the time period between August 14, 2013 and August 29, 2014.  Tr. 483-89, 499-50, 528; P. Ex. 2B, D.E. 15-11.  In sum, based upon Elfante's testimony and the bank records, Duran concluded that Elfante authorized withdrawals totaling $189,691.96, and the total amount of unauthorized withdrawals was $187, 040.34.[3]  Tr. 491; P. Ex. 2B, D.E. 15-11.  Duran also testified to tracing the unauthorized withdrawals to Petitioner, including cash withdrawals, deposits made into Petitioner's business and personal bank accounts, and payment of Petitioner's personal expenses, including tax liabilities, personal travel expenses and college tuition payments made on behalf of Petitioner's son.  Tr. 492-535; P. Ex. 2B, D.E. 15-11.  According to both Elfante and Duran, the unauthorized funds were never returned to Elfante's account.  Tr. 263-93, 365, 491, 505.  Chris McDonough, an attorney and expert in professional ethics, testified on behalf of the prosecution regarding his expertise relating to the maintenance

---

[3] Elfante testified that from time to time she would request checks from Petitioner so that Elfante could access money in the account.  Tr. 256.

and operation of escrow accounts and agreements.[4]  *Id.* 562-67.  McDonough testified that the New York Rule of Professional Conduct 1.15[5] ("Rule 1.15") defines escrow and governs an attorney's duties and obligations regarding escrow accounts.  *Id.* 567.  McDonough's testimony clarified for the jury the workings of escrow accounts and the rules for their operation, including proscriptions against comingling and unauthorized withdrawals.  *Id.* 567-73.

       At the close of the prosecution's case, defense counsel moved for a trial order of dismissal based on the following arguments: (1) the evidence at trial established that there was a signed retainer agreement, which was *prima facie* proof of a contractual obligation; (2) the evidence at trial was insufficient to establish that there was intent to deprive Elfante of property; and (3) Elfante's testimony was ambiguous and, as such, could not establish *prima facie* proof of the alleged criminal charges.  *Id.* 599-610.  The trial court denied the motion.  *Id.* 614.  The defense did not present a case and at the close of the evidence at trial defense counsel renewed the motion for a trial order of dismissal, which the trial court denied.  *Id.*

     Following summations, instructions and deliberations, on January 29, 2018, the jury convicted Petitioner of Grand Larceny in the Second Degree and acquitted her of two counts of Falsifying Business Records in the First Degree.  *Id.* 727-28.  On March 20, 2018, the trial court

---

[4] Prior to trial, the prosecution informed defense counsel and the trial court that they intended to a call an ethics expert witness to explain escrow accounts, and the trial court ruled, over defense counsel's objection, that the prosecution may call an expert witness to testify explaining the relationship involved in an escrow account and the obligations thereunder, but was not permitted to interpret any contract involved in the case.  Tr. 21-28.  During jury selection, the prosecution provided a list of names of prospective expert witnesses, McDonough listed among them.  Tr. 44-46. During Elfante's testimony, the prosecution stated that they retained McDonough as their expert witness, disclosed his fee, and furnished defense counsel with his *curriculum vitae* and a one page report prepared one week earlier.  Tr. 351-52.  The trial court denied defense counsel's motion to preclude McDonough based on the late disclosure, but allowed defense counsel time to review the report before allowing McDonough to testify.  Tr. 352-57.

[5] The trial court took judicial notice of Rule 1.15 at the prosecution's request and over defense counsel's objection. Tr. 587-94, 598.  Defense counsel argued that the Professional Rules of Conduct had no place in a criminal proceeding and would only serve to bolster the expert's testimony, however the court overruled defense counsel's objection.  Tr. 587-92.

sentenced Petitioner to three-and-one-third to ten years' imprisonment and directed Petitioner to pay $187,040.34 in restitution.  S. 25.

## II. POST-CONVICTION PROCEEDINGS

### A. The Direct Appeal

On March 21, 2018, Petitioner appealed her conviction to the Second Department of the New York State Appellate Division.  *See* Notice of Appeal, D.E. 15-15.  On appeal, Petitioner argued that: (1) the Grand Jury proceedings were defective due to the prosecution's failure to properly instruct the Grand Jury as to a claim of right defense; (2) the trial court's jury instructions, regarding the adverse-inference jury charge and circumstantial evidence charge, violated her Due Process rights; (3) the trial court improperly admitted the testimony of both an improperly-noticed legal ethics expert witness and an investigator employed by the District Attorney's Office; (4) the trial court denied her Sixth Amendment rights by failing to So-Order a subpoena duces tecum for impeachment materials and for curtailing defense counsel's cross-examination of the complainant; (5) the trial court's refusal to issue sanctions for the late disclosure of *Rosario* material and late expert witness disclosure was an abuse of discretion and constituted reversible error; (6) the trial court's admission of reproduced, unauthenticated, and incomplete text messages was an improvident exercise of discretion; (7) the evidence was legally insufficient to establish the crime of Grand Larceny in the Second Degree, or, in the alternative, the verdict was against the weight of the evidence; and (8) the sentence imposed was harsh and excessive.  *See* Def.'s App. Br., August 31, 2018 ("App. Div. Br."), D.E. 15-16, at 26-63.

The Appellate Division, Second Department affirmed Petitioner's conviction on August 21, 2019.  *People v. Enoksen*, 175 A.D.3d 624 (N.Y. App. Div. 2d Dep't 2019).  With respect to

7

Petitioner's defective Grand Jury proceedings claim, the Second Department agreed with the trial court's decision to deny Petitioner's motion to dismiss the indictment based on the failure of the prosecutor to instruct the grand jurors on a claim of right defense. *Id.* at 625. The Appellate Division held that, viewing the evidence in the light most favorable to Petitioner, there was no reasonable view of the evidence presented to the Grand Jury warranting an instruction on that defense. *Id.*

Additionally, the Appellate Division rejected Petitioner's arguments that the evidence was either legally insufficient or that the verdict was against the weight of the evidence. *Id.* The Second Department also agreed with the trial court's decision to allow the prosecution to introduce a document, created by complainant, reflecting numerous text messages between the complainant and Petitioner, finding that the complainant's testimony was sufficient to authenticate the document. *Id.* at 625-26. Further, the Appellate Division held that it was within the trial court's discretion to allow the prosecution to call both an expert witness and the witness who summarized voluminous bank records related to the escrow account in question. *Id.* at 626. The Appellate Division held that the expert witness in particular served to clarify matters beyond the ken of the typical juror. *Id.*

Furthermore, the Second Department ruled that the trial court "providently exercised its discretion" in precluding defense counsel from questioning the complainant regarding her alleged mental health treatment on cross-examination, after the defense failed to demonstrate that the complainant suffered from any condition related to her ability to recall and perceive the acts committed against her. *Id.* Regarding Petitioner's jury charge claim, the Appellate Division held that the trial court's jury instructions, viewed in its entirety, clearly explained reasonable doubt and the prosecution's burden of proof, and made it clear that the defendant bore no burden of proof.

*Id.*  The Appellate Division also determined that Petitioner's sentence was not excessive, and held all her remaining contentions to be without merit.  *Id.*   On November 13, 2019, the New York State Court of Appeals denied Petitioner's request for leave to appeal.  *People v. Enoksen*, 34 N.Y.3d 1016 (N.Y. 2019).

### B. The State Habeas Petition

In July 2018, Petitioner filed a state habeas corpus petition in the Supreme Court, Orleans County, New York, seeking relief on the grounds that the New York State Department of Corrections and Community Supervision ("DOCCS") failed to transfer her from county jail to state prison within ten days of her sentence.  *See* Resp.'s Aff. and Mem. in Opp., D.E. 15, at viii. On July 31, 2018, the Orleans County Supreme Court denied her application for a writ of habeas corpus, and on August 13, 2018 denied her motion to reargue.  *See* Aug. 13, 2018 Dec. and Order, D.E. 2-12, at ECF 3-4.

On October 1, 2018, Petitioner appealed the Supreme Court's decision to the Appellate Division, Fourth Department.  *See* Initial Brief for Relator-Appellant ("Rel. Br."), Oct. 1, 2018, D.E. 2-11.  In her appeal, Petitioner argued that she should be released from state custody due to the following errors: (1) DOCCS failed to timely transfer Petitioner to state custody pursuant to C.P.L. § 430.20, thereby losing legal custody of Petitioner; (2) DOCCS violated her Due Process rights by failing to timely transfer her pursuant to C.P.L. § 430.20; (3) DOCCS violated her liberty rights pursuant to the Fourteenth Amendment by failing to timely transfer her pursuant to C.P.L. § 430.20, thereby creating an atypical hardship; and (4) DOCCS created an atypical hardship on her by failing to timely transfer her pursuant to C.P.L. § 430.20.  *Id.* at ECF pp. 4-5.

The Appellate Division, Fourth Department denied Petitioner's leave to reargue and affirmed the Supreme Court's decision denying the writ.  *People ex rel. Enoksen v. Squires*, 173

A.D.3d 1684 (4th Dept. 2019).  Petitioner did not seek leave to appeal the Fourth Department's decision to the New York Court of Appeals.

## III. DISCUSSION

### A. Standard of Review

This petition is reviewed under the well-established standard of review of habeas corpus petitions, including the authority of this Court to review such matters, the application of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the exhaustion doctrine, the independent and adequate procedural bar, the cause and prejudice exception, AEDPA deference, the evaluation of claims of ineffective assistance of counsel and Brady violations, and the liberal construction afforded to filings by *pro se* petitioners,[6] as more fully discussed in *Licausi v. Griffin*, 460 F. Supp. 3d 242, 255–60 (E.D.N.Y. 2020), *appeal dismissed*, No. 20-1920, 2020 WL 7488607 (2d Cir. Nov. 17, 2020).  The discussion of these principles set forth in *Licausi* is incorporated herein by reference.

### B. The Instant Petition

Petitioner seeks habeas relief on eight separate grounds, claiming that: (1) the grand jury presentation was impaired such that the indictment against her should have been dismissed and her Due Process rights were severely prejudiced at trial; (2) the trial court's jury instructions violated Due Process, the Fourteenth Amendment, and the Sixth Amendment; (3) the trial court violated her Due Process rights by making numerous evidentiary rulings, including allowing

---

[6] There is authority to suggest that where, as here, the petitioner is a lawyer, "[s]he cannot claim the special consideration which the courts customarily grant to pro se parties."  *Harbulak v. Suffolk Cty.*, 654 F.2d 194, 198 (2d Cir. 1981).  However, since this is a habeas petition implicating important constitutional rights, the Court has, out of an abundance of caution, afforded the plaintiff's submissions significant solicitude.

testimony from a financial investigator and an expert witness; (4) the trial court violated her Due Process rights by refusing to issue a subpoena seeking Elfante's mental health records and by curtailing defense counsel's cross-examination of Elfante; (5) the trial court denied her *Rosario* rights; (6) the trial court violated the Best Evidence Rule by admitting into evidence a reproduction of a text message conversation between Petitioner and Elfante; (7) the evidence presented at trial was legally insufficient to support her conviction; and (8) the timing of her transfer to the State prison system violated C.P.L § 430.20 and her Due Process rights.  Petitioner's Memorandum ("Pet.'s Mem."), D.E. 2, at 2-14.  All of Petitioner's claims are either procedurally barred or without merit.  Only one ground cited by Petitioner, to wit: the challenge to the trial court's jury charge regarding her invocation of her Fifth Amendment right to remain silent, bears extended discussion.

### 1.    The Challenged Jury Charge[7]

*a. Genesis of the Charge*

The background of the challenged charge, along with its precise phrasing, is relevant to the resolution of this claim.  The trial record is silent as to a charging conference, or as to whether counsel was afforded the opportunity to submit requests to charge.  In fact, the record suggests the opposite conclusion.

Prior to charging the jury, the trial court advised counsel as follows:

[W]e intend to go standard CJI. So you shouldn't have any question about that.  Burden of proof, reasonable degree, all the standard sections, credibility, false

---

[7] In addition to the testimonial inference charge, the Petitioner also challenges the Court's provision of a circumstantial evidence charge.  Because, as noted by the trial court, its view of the evidence suggested that the prosecution's case included elements of circumstantial evidence, the provision of this charge cannot be viewed as erroneous.  Even assuming it was erroneous, and is actionable in the context of a habeas proceeding, any such error would clearly be harmless.

> in uno.  All of the standard sections, but expanded intent we do as a matter of course, okay? So let's proceed from there.

Tr. 618; *cf. id.* 690 ("Standard CJI with respect to all charges").  Proceeding with the jury charge, the trial judge instructed the jury as to the defendant's exercise of her Fifth Amendment rights as follows:

> Although the defendant had a right to testify on her own behalf, she did not do so. The fact that the defendant did not testify is not a factor from which any inference unfavorable to the defendant may be drawn.

*Id.* 704.[8]  This charge was plainly not the "standard CJI" charge for two reasons.  First, the relevant "Criminal Jury Instruction" available on the nycourts.gov website provides, in its entirety, as follows:

> The fact that the defendant did not testify is not a factor from which any inference unfavorable to the defendant may be drawn.

*Instructions of General Applicability – Defendant's Conduct: Defendant Who Does Not Testify*, N.Y. State Unified Court System, http://www.nycourts.gov/judges/cji/1-General/cjigc.shtml (last updated Nov. 9, 2020).  This sentence is identical to the second sentence of the trial court's charge; hence the trial judge added the first sentence of his charge of his own accord.   The notes that accompany the Standard Jury Instruction provide:

> The statute specifies that the charge must be given "[u]pon request of a defendant who did not testify in his own behalf, but not otherwise." Appellate courts have cautioned that this statutory charge should be given only upon the defendant's request, and when given, the charge should be limited to the statutory language.

*Id.*  (collecting cases).  And, in fact, the statute referenced, N.Y. Crim. Proc. Law § 300.10(2), provides expressly as stated in the notes, *i.e.*, that this charge should be given only "[u]pon request of a defendant . . . but not otherwise."

---

[8] In her petition, Petitioner accurately, though incompletely, reproduces the instruction, quoting only the first sentence and omitting the second.  Pet.'s Mem., D.E. 2, at 4.  Standing alone, the first sentence would constitute a whole different kettle of fish.

For avoidance of doubt, the focus upon the state statutory language is not relevant for the purpose of consideration of habeas relief: the law is patently clear that a violation of a right conferred by state law is not cognizable in this context.  However, that the substance of the jury instruction given – as well as the procedure for its deployment – differs from that of the statutorily prescribed instruction is relevant for the purpose of determining whether Petitioner requested and/or consented to this charge.   That its use and content differ dramatically from the pattern instruction and associated law plainly demonstrates that the charge was not – as promised by the trial judge – "standard CJI."  Thus, for the purposes of this analysis, Petitioner cannot be said to have requested or assented to this charge.

Indeed, upon completion of the charge, defense counsel immediately lodged an objection to the challenged instruction:

> Additionally, there was the defendant's right to testify. The Court's phraseology of the instruction specific to the right, and then the defendant chose not to, in my opinion, overemphasizes the defendant's decision in that case.  The instruction should have been more aptly appropriated to the fact that the -- in a criminal case, a defendant doesn't have a right – she does not have to testify, and the jury is to form no inference either way. That type of language would have been the more appropriate language as opposed to emphasizing the choice made by the defendant in this particular case. Whether or not it's the defendant's choice or not, it's not really relevant to the jury's consideration. It overemphasizes that, in this case, the defendant chose not to.

Tr. 717.   The Court overruled that objection without further comment.  *Id.* 718.  Petitioner now argues that the trial court's jury instructions regarding her failure to testify violated her right to Due Process under the Fourteenth and Sixth Amendments.  Pet.'s Mem., D.E. 2, at 4.

Because we read the Petition broadly, giving the *pro se* filings wide deference, the Court construes the petition as raising two distinct issues as to this jury charge.  First, can the defendant obtain relief based upon the substance of the subject jury instruction?  Second, does the fact that

the instruction was given without a request by the defendant (and over her objection) warrant grant of the habeas petition?

*b. Rights Implicated by the Challenged Jury Instruction*

The challenged jury charge implicates three interrelated, though distinct, interests: the right of the accused against self-incrimination, the right to testify in one's own defense and the presumption of innocence. The protection against compelled self-incrimination is found expressly in the Fifth Amendment of the United States Constitution, which provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Second Circuit has held that "The Fifth Amendment grants a criminal defendant the right not to testify at trial. The amendment also precludes a jury from drawing an adverse inference from the defendant's exercise of this right." *United States v. Imran*, 964 F.2d 1313, 1318 (2d Cir. 1992) (citing *Carter v. Kentucky*, 450 U.S. 288, 305 (1981)).

By contrast, the right to testify on one's own behalf "has sources in several provisions of the Constitution." *Rock v. Arkansas*, 483 U.S. 44, 51 (1987). It represents one of the "necessary ingredients of the Fourteenth Amendment's guarantee that no one shall be deprived of liberty without due process of law." *Id.* Additionally, as the Supreme Court has held, the right also emanates from the Sixth Amendment:

> The right to testify is also found in the Compulsory Process Clause of the Sixth Amendment, which grants a defendant the right to call "witnesses in his favor," a right that is guaranteed in the criminal courts of the States by the Fourteenth Amendment. Logically included in the accused's right to call witnesses whose testimony is "material and favorable to his defense," is a right to testify himself, should he decide it is in his favor to do so. In fact, the most important witness for the defense in many criminal cases is the defendant himself.
>
> . . . .
>
> Even more fundamental to a personal defense than the right of self-representation . . . is an accused's right to present his own version of events in his

14

own words. A defendant's opportunity to conduct his own defense by calling witnesses is incomplete if he may not present himself as a witness.

*Id.* at 52 (citations omitted).   Lastly, the right to testify "is also a necessary corollary to the Fifth Amendment's guarantee against compelled testimony."  *Id.*  at 52-53 (citing *Harris v. New York*, 401 U.S. 222, 225 (1971) ("Every criminal defendant is privileged to testify in his own defense, or to refuse to do so.")).

The presumption of innocence and associated burden of proof represent the third interest potentially implicated by the challenged jury instruction.  While not explicitly mentioned in the Constitution, "[t]he principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law."  *Coffin v. United States*, 156 U.S. 432, 453 (1895).  This bedrock principle clearly falls within the ambit of the Due Process Clause:

> While use of the particular phrase "presumption of innocence" —or any other form of words—may not be constitutionally mandated, the Due Process Clause of the Fourteenth Amendment must be held to safeguard "against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." The "purging" effect of an instruction on the presumption of innocence simply represents one means of protecting the accused's constitutional right to be judged solely on the basis of proof adduced at trial.

*Taylor v. Kentucky*, 436 U.S. 478, 485–86 (1978) (citations omitted).

An attempt to safeguard the first of these three principles, *i.e.*, the Petitioner's right against self-incrimination, appears to have been the purpose of the challenged jury instruction.  And there is good reason to make such an effort, as a well-developed line of jurisprudence charges a trial judge with the duty to help ensure that no adverse inference is drawn against a non-testifying defendant.  This obligation encompasses not only a bar on suggesting that a negative inference be drawn from a defendant's refusal to testify, but also an affirmative obligation to, when requested,

proscribe the jury from making such an inference.  In *Griffin v. California*,, the Supreme Court held that a negative "comment on the refusal to testify" by a defendant "is a penalty imposed by courts for exercising a constitutional privilege [which] cuts down on the privilege by making its assertion costly."  *Griffin v. California*, 380 U.S. 609, 614 (1965).  Then, in *Carter v. Kentucky*, the Supreme Court granted habeas relief where a state criminal court judge refused petitioner's request for a no-adverse inference instruction, holding:

> A trial judge has a powerful tool at his disposal to protect the constitutional privilege—the jury instruction—and he has an affirmative constitutional obligation to use that tool when a defendant seeks its employment. No judge can prevent jurors from speculating about why a defendant stands mute in the face of a criminal accusation, but a judge can, and must, if requested to do so, use the unique power of the jury instruction to reduce that speculation to a minimum.

*Carter v. Kentucky*, 450 U.S. 288, 303 (1981).

The problem here lies in the first sentence of the charge.  In instructing the jurors that "[a]lthough the defendant had a right to testify on her own behalf, she did not do so," the trial judge did not advise the jurors about petitioner's Fifth Amendment right against self-incrimination. Instead, the judge described the Petitioner's right to testify on her own behalf, which, as discussed above, represents a distinct (if nevertheless related) right to the right to remain silent.  That was error.  And the language used varies substantially, not only from the standard CJI charge prescribed by New York law, but also from the instructions widely documented in the caselaw.

The requested instruction in *Carter v. Kentucky*, cited with approval by that decision, clearly describes the right against self-incrimination and prohibits jurors from drawing a negative inference from its invocation:

> The [defendant] is not compelled to testify and the fact that he does not cannot be used as an inference of guilt and should not prejudice him in any way.

16

*Id.* at 294.  Derived from this, one model federal jury instruction incorporates these concepts and ties the instruction back to the presumption of evidence and burden of proof:

> The defendant in a criminal case has an absolute right under our Constitution not to testify.
>
> The fact that Defendant _____ did not testify must not be discussed or considered in any way when deliberating and in arriving at your verdict. No inference of any kind may be drawn from the fact that a defendant decided to exercise *[his] [her]* privilege under the Constitution and did not testify.
>
> As stated before, the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or of producing any evidence.

1A Fed. Jury Prac. & Instr. § 15:14 (6th ed.).  Courts of Appeals for nearly every circuit have adopted, approved and/or mandated similar formulations which include a description of the prohibition against compelled self-incrimination and, in many instances, explanation of its relationship to the presumption of innocence and burden of proof.  *See id.* (citing *United States v. Medina-Martinez*, 396 F.3d 1, 7–8 (1st Cir.), *cert. denied*, 544 U.S. 1007 (2005) ("[Defendant] has a constitutional right not to testify . . . ."); *U.S. v. Flores*, 454 F.3d 149, 161 (3d Cir. 2006), *cert. denied*, 127 S. Ct. 614, (U.S. 2006) ("The law does not require a defendant in a criminal action to take the witness stand and testify."); *Pattern Jury Instructions of the District Judges Association of the Fifth Circuit, Criminal Cases*, Instruction No. 1.01 ("The defendant has no burden to prove his or her innocence, or to present any evidence, or to testify."); *Pattern Jury Instructions of the District Judges Association of the Sixth Circuit, Criminal Cases*, Instruction No. 7.02A (2005) ("A defendant has an absolute right not to testify . . . ."); *Seventh Circuit Criminal Jury Instructions*, Instruction No. 2.05 (2012) (same); *United States v. Templeman*, 481 F.3d 1263, 1265-66 (10th Cir. 2007) (same), *United States v. Teague*, 953 F.2d 1525, 1539 (11th Cir. 1992), *cert. denied*, 506 U.S. 842 (1992) ("The law does not require a Defendant to prove innocence or to produce any

evidence at all; and if a Defendant elects not to testify, you cannot consider that in any way during your deliberations.")).

As indicated above, New York has adopted a briefer version of this instruction which does not describe the rights involved, but directs the jury solely that "the fact that [the defendant] did not testify is not a factor from which any inference unfavorable to the defendant may be drawn." N.Y. Crim. Proc. Law § 300.10.

The parties have not cited, nor has the Court's research revealed, a reported case decision reflecting use of jury instructions like the one employed here: the description of the defendant's right to testify, rather than the Fifth Amendment right against incrimination, as the predicate for providing the adverse inference prohibition.  But did instructing the jurors that Petitioner had a "right to testify on her own behalf, [but] she did not do so" constitute a negative comment on the petitioner's invocation of her Fifth Amendment right?  In isolation, it could be viewed as such. There certainly is a risk that, as defense counsel raised in his contemporaneous objection, the trial court's instruction "overemphasizes that, in this case, the defendant chose not to [testify]".  Tr. 717.  However, the law directs that the instruction not be considered in a vacuum.

The Seventh Circuit faced a not dissimilar situation in *United States v. Skidmore*, in which the trial court charged the jury in the case of a non-testifying defendant as follows:

> "[t]he jury will always bear in mind that the law never imposes on a defendant in a criminal case the duty of calling any witnesses or producing any evidence, and no adverse inference may be drawn from his failure to do so."

*United States v. Skidmore*, 254 F.3d 635, 639 (7th Cir. 2001).   The Seventh Circuit's analysis is helpful in reviewing the present situation:

> It should first be noted that this case does not implicate Skidmore's privilege against compulsory self-incrimination under the Fifth Amendment. *See United States v. Sblendorio*, 830 F.2d 1382, 1391 (7th Cir.1987) (noting that a "defendant's decisions about evidence other than his own testimony do not implicate the

18

privilege"). Instead, what is at issue here is the ever present notion in our criminal justice system that Skidmore was to be presumed innocent of the charges against him until proven guilty, and that he had no obligation whatsoever to call any witnesses or produce any evidence of his innocence at his trial. We agree with Skidmore that his decision not to present any witnesses or evidence should not have been referred to as a "failure" of any kind on his part. The court's use of this word in the instruction is problematic because, as Skidmore notes in his brief, it carries with it the possible implication from the court to the jury that Skidmore has neglected a responsibility to present testimony and other evidence. A conscious decision by a defendant not to testify, present other witnesses, or produce any other evidence should not be characterized in the instructions as constituting a failure on the part of a defendant. Ironically, the district court used the word failure in explaining to the jury that Skidmore had a right not to present witnesses or any other evidence and that it was not permitted to draw any negative conclusions from his decision to exercise this right.

*Id.* at 639–40. Thus, as in the present case, the trial court's erroneous instruction bore upon the questions of presumption of innocence and burden of proof, rather than the privilege against self-incrimination. Ultimately, the Seventh Circuit found that "inclusion of the word failure in this case does not constitute plain error," but opted to "emphasize that this language should not be used in similar jury instructions in the future." *Id.* at 640. Of course, the trial judge in the present case did not use the word "failure," but the erroneous description of the right to testify combined with the phrase "she did not do so," could well be read to imply a failure on Petitioner's part.

The Second Circuit considered a related issue in *United States v. Imran*, in which the Court reviewed a jury instruction by Judge Glasser which provided as follows:

The defendant is presumed to be innocent of the charges which have been brought against him. He is under no obligation to prove his innocence. He is under no obligation to prove anything. He is under no obligation to offer evidence. And no adverse inference must be drawn from the fact that the defendant stood upon his constitutional right to remain silent. The fact that he chose to remain silent should not enter into your deliberation in any way.

*United States v. Imran*, 964 F.2d 1313, 1317 (2d Cir. 1992). Judge Glasser's instruction was, plainly, far more generous and inclusive than that examined in *Skidmore* and, for that matter, the instruction at issue here. In fact, the defendant's sole quarrel with Judge Glasser's instruction to

19

the jury in *Imran* was his instruction that the defendant was "under no obligation to offer evidence," while defendant contended on appeal only that the word "testimony" should have been used in place of "evidence."   The Circuit upheld the conviction, noting that a "defendant does not have the right to dictate the precise language of a jury instruction."  *Id.* at 1317.  Nevertheless, the panel seemed to do so with some reservation:

> Although we hold that the district court's charge harmonizes with the Fifth Amendment, we note that the harmony would have been more mellifluous had the district court explicitly stated that Imran had the right not to testify. Indeed, we find the district court's charge particularly curious because at Imran's first trial, the court did expressly state that Imran was "not obligated to testify on his own behalf." Nevertheless, the existence of a "better" instruction does not render the given charge constitutionally infirm. Because the district court's charge adequately captured both Imran's right not to testify and the jury's obligation not to draw any adverse inference therefrom, the charge was not erroneous.

*Id.* at 1318.   If the charge in Imran may be characterized as "unmellifluous," the charge in this case could well be described as cacophonous.

Yet, importantly, the decision in *Imran* provides the framework for review of the challenged instruction:[9]

> Our review of a jury charge proceeds in two stages. First, we examine the "specific language challenged to determine whether it passes [constitutional] muster." *United States v. Carr*, 880 F.2d 1550, 1555 (2d Cir.1989) (citing *California v. Brown*, 479 U.S. 538, 541, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987)). If the language is deficient, we "review the instructions as a whole to see if the entire charge delivered a correct interpretation of the law." *Brown*, 479 U.S. at 541, 107 S.Ct. at 839.

*Id.*  at 1317.  At the first stage, the instruction at issue here does not pass constitutional muster, as the trial court failed to properly define the Fifth Amendment right against self-incrimination, and by erroneously charging the right *to* testify, created, at least arguably, an instruction that improperly bears on the presumption of innocence and burden of proof, through an implication

---

[9] Obviously, like the use of the word "failure" in *Skidmore*, replication of the jury instruction used here in future proceedings would be highly inadvisable.

concerning defendant's failure to testify.  Under existing law this error raises serious questions, but may not be sufficient to warrant habeas relief.  As the Supreme Court has held:

> Before a federal court may overturn a conviction resulting from a state trial in which [a challenged] instruction was used, it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment.

*Cupp v. Naughten*, 414 U.S. 141, 146 (1973).   To determine whether Petitioner has satisfied this exacting standard, we turn to the next stage of the analysis.

   *Imran* next requires that the Court conduct a second stage of review, to wit: consideration of the challenged instruction in the context of the charge as a whole.  *Imran*, 964 F.2d at 1317; *see also Cupp,* 414 U.S. at 146-47 ("In determining the effect of this instruction on the validity of respondent's conviction, we accept at the outset the well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.").  Here, the matter becomes patent.   Shortly before the challenged instruction, the trial judge advised the jury that:

> The defendant is not required to prove that she is not guilty. In fact, the defendant is not required to prove or disprove anything.

Tr. 698.  And, of course, immediately following the erroneous charge, the trial judge advised the jury that "The fact that the defendant did not testify is not a factor from which any inference unfavorable to the defendant may be drawn." Tr. 704.  These directives, bookending the erroneous instruction, together with the balance of the jury charge, lead to the conclusion that the "entire charge delivered a correct interpretation of the law." *Imran*, 964 F.2d at 1317; s*ee generally* Tr. 690-716.  Thus, this Court agrees with the Appellate Division that, in this case, "[c]ontrary to the defendant's contention, the Supreme Court's charge to the jury, viewed in its entirety, adequately explained the concepts of reasonable doubt and the People's burden of proof, and made it clear

21

that the defendant bore no burden of proof." *Enoksen*, 175 A.D.3d at 626.  For the purposes of habeas review, this Court holds that the erroneous instruction did not "so infect[] the entire trial that the resulting conviction violat[ed] due process." *DelValle v. Armstrong*, 306 F.3d 1197, 1201 (2d Cir. 2002).  As such, the Court agrees that the Appellate Division's decision was not contrary to, or an unreasonable application of, clearly established federal law.

### c. Provision of the Instruction Over Petitioner's Objection

Petitioner also argues that utterance of the subject charge itself warrants habeas relief. Stated more precisely, the trial judge apparently gave the instruction to the jury without giving Petitioner's counsel an opportunity to object, and failed to provide any remedy when the issue was raised in an objection lodged after the instruction was given.

This Court need not decide whether the failure to accurately provide counsel with advance notice of the instructions it intended to submit to the jury constitutes a violation of state law or procedure.  However, providing counsel with written notice of the proposed jury instruction plainly represents a better practice.  *See United States v. Birbal*, 62 F.3d 456, 459 n.1 (2d Cir. 1995) ("[M]any, if not most, district judges in this circuit routinely provide counsel with written copies of their jury instructions in advance of reading them to the jury, thereby giving counsel adequate opportunity to register their objections. In order that errors may be corrected, where possible, before they infect the jury, we strongly encourage those judges who do not already do so to follow this practice.").  In fact, in federal civil cases, courts are required to inform counsel of their proposed instructions before charging the jury, *see* Fed. R. Civ. P. 51, and this concern similarly fuels New York's *O'Rama* procedure for handling jury notes, *see People v. Mack*, 27 N.Y.3d 534, 539 (2016) (whereby a trial judge must "discuss the note or the court's intended response with counsel before recalling the jury into the courtroom").  In this case, the trial judge misinformed

counsel as to its intended instructions by assuring that it would rely on "standard CJI" charges when, in fact, it did not.  While troubling, this inadvisable practice does not warrant habeas relief, as counsel was able to lodge an objection immediately after the charge was given.  Thus, this case, as a practical matter, does not differ materially from one in which the adverse inference instruction was given over a defendant's objection.[10]

And the law clearly provides that so instructing the jury over a petitioner's objection does not warrant habeas relief.  The Supreme Court has held, for example, in *Lakeside v. Oregon*:

> The trial judge in this case determined in the exercise of his duty to give the protective instruction in the defendant's interest. We have held that it was no violation of the defendant's constitutional privilege for him to do so, even over the objection of defense counsel.

*Lakeside v. Oregon*, 435 U.S. 333, 342 (1978).  And, as held by at least one other court, where, as here, the proof of guilt is overwhelming, the fact that a "no adverse inference charge is given without a request from the defendant" falls into the ambit of the harmless error doctrine.  *Liner v. John Keane*, No. 95 CIV. 2738 (KMW), 1996 WL 33990, at *8 (S.D.N.Y. Jan. 3, 1996).

Based on the foregoing, the request for habeas relief predicated upon the erroneous adverse inference charge is denied.

### 2.      The Remaining Challenges by Petitioner

As noted, all of petitioner's remaining contentions are procedurally barred and without merit.  Some are rooted in state law rights that are simply not cognizable on a habeas petition,

---

[10] Of course, this may be a case of first impression in that, in this instance, the trial judge misadvised counsel as to the charge he intended to provide, and then proceeded to instruct the jury with an erroneous charge.   This combination can readily be characterized as troubling.  Nonetheless, given this Court's review of the charge taken as a whole, it cannot be said that this peculiar (and highly inadvisable) procedure was contrary to, or represented an unreasonable application of, clearly established federal law.

including her claims regarding grand jury errors,[11] jury instruction issues,[12] evidentiary rulings,[13] *Rosario* discovery violations,[14] misapplication of the best evidence rule,[15] and those emanating from her incarceration at various facilities and participation in a SHOCK program.[16]   Several

---

[11] *See Davis v. Mantello,* 42 F. App'x 488, 490 (2d Cir. 2002) ("Claims of deficiencies in state grand jury proceedings are not cognizable in a habeas corpus proceeding in federal court.").   In New York, a grand jury indictment arises from the "State Constitution and other state laws . . . and federal habeas relief may not be granted for violations of state law." *Robinson v. LaClair,* No. 09-CV-3501, 2011 WL 115490, at *8 (E.D.N.Y. Jan. 13, 2011).   And "even if a defective state indictment constituted proper grounds for federal habeas review, any injury that petitioner claims from the defective indictment was cured by the jury's verdict of guilt beyond a reasonable doubt at his trial." *Id.*   To the extent Petitioner now asserts, for the first time, that the purported defective jury charge violated federal law and her constitutional rights, that claim is procedurally barred and meritless.   The trial record demonstrates that Petitioner was not estopped from utilizing the claim of right defense at trial as a result of the Grand Jury presentation because Petitioner had the opportunity to avail herself of the claim of right defense jury instruction and rejected it, and there is nothing in the record to support her claim of prejudice.

[12] *Cupp,* 414 U.S. at 146-47 (jury instruction argument in habeas petitions generally rooted in state law).   Additionally, and as discussed *supra* in FN 7, Petitioner's claim that the circumstantial evidence jury charge violated Due Process fails on the merits and is denied.

[13] "Under Supreme Court jurisprudence, a state court's evidentiary rulings, even if erroneous under state law, do not present constitutional issues cognizable under federal habeas review." *McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 72-73 (2d Cir. 2011) (citing *Hawkins v. Costello*, 460 F.3d 238, 244 (2d Cir.2006)); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").   Such claims do not constitute constitutional magnitude unless the evidentiary error was "so pervasive as to have denied [defendant] a fundamentally fair trial." *Collins v. Scully*, 755 F.2d 16, 18 (2d Cir. 1985).   Additionally, Petitioner's evidentiary claims fail on the merits as she is unable to demonstrate that the admission of Duran and McDonough's testimony was manifestly erroneous or rendered her trial fundamentally unfair. *See Collins*, 755 F.2d at 19; *United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985).   McDonough, an ethics expert, explained what an escrow account is and the rules governing an escrow relationship, and, as such, explained issues beyond the ken of the typical juror. *See People v. Williams*, 20 N.Y.3d 579, 583-84 (2013); Fed. R. Evid. § 702.   Petitioner also raises a number of procedurally barred claims, which are likewise meritless.   Petitioner's Brady violation claim fails to even articulate what Brady material, or "material" evidence, was allegedly withheld, Petitioner's perjury claim is unfounded, and while the trial court took judicial notice of Rule 1.15, the trial court specifically directed that no argument that a violation of the ethical rules was tantamount to a criminal act would be permitted.   As such, none of Petitioner's procedurally barred claims warrant habeas relief.

[14] *Estelle v. McGuire*, 502 U.S. 62, 67 (1991); *see also Perkins v. Bennett*, No, 97-CV-5917, 2003 WL 21696946, at *2 (E.D.N.Y. June 18, 2003) (finding that the petitioner's *Rosario* claim did not "rise to the level of a federal constitutional violation, as required for habeas review"); *Landy v. Costello*, 141 F.3d 1151, No. 97-CV-2433, 1998 WL 105768, at *1 (2d Cir. 1998) ("To the extent that this claim is based on a *Rosario* violation, it must fail, because a habeas petition can only be granted to remedy some violation of *federal* law; the obligation to turn over *Rosario* material arises under *state* law.").   Even if the trial court's *Rosario* ruling was in error, that error was not "substantial and injurious" such that it influenced the jury's determination as defense counsel was granted adequate time to review the disclosed materials prior to expert witness McDonough's testimony. *See Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993).

[15] *Toliver v. Sheahan*, No. 13-CV-5056, 2015 WL 2359085, at *19 (S.D.N.Y. May 18, 2015) ("[T]he best evidence rule is a state law evidentiary principle rather than a constitutional mandate, and thus is not a proper subject of habeas relief.").   Additionally, Petitioner cannot demonstrate that admission of the reproduced text messages into evidence was so extremely unfair that its admission violated the fundamental concepts of justice, or that it was so pervasive such that it denied her a fundamentally fair trial, and, thus, her claim does not warrant habeas relief.

[16] *See Patterson v. New York*, 432 U.S. 197, 201-02, (1977) ("[I]t is normally 'within the power of the State to regulate procedures under which its laws are carried out . . . ,' and its decision in this regard is not subject to proscription under the Due Process Clause unless 'it offends some principle of justice so rooted in the traditions and conscience of our

factually based claims were fully considered by the state court, as to which determinations this Court must defer under the AEDPA. *See Enoksen*, 175 A.D.3d at 625-6. Petitioner cannot proceed on claims subject to the procedural bar, as she has failed to demonstrate (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law" or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Thus, the petition is denied in its entirety.

## IV. CONCLUSION

Because the Court has considered all of Petitioner's arguments and found them meritless, the petition is DENIED. As to all grounds other than the challenged adverse inference charge, a certificate of appealability shall not issue because Petitioner has not made a substantial showing that she was denied any constitutional rights. *See* 28 U.S.C. § 2253(c)(2). I certify that any appeal of this Order as to those issues would not be taken in good faith, and thus *in forma pauperis* status is denied for the purposes of any appeal on those grounds. *Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

On the other hand, as to the question of the erroneous adverse inference charge, a certificate of appealability shall issue as the Petitioner has raised a substantial showing of the denial of a constitutional right, even though that denial may well have been harmless error. *See* 28 U.S.C.

---

people as to be ranked as fundamental.'" (citations omitted)); *see also Hurley v. Fischer*, No. 09-CV-1684, 2012 WL 463895, at *6 (E.D.N.Y. Feb. 13, 2012) (holding that "whether the state court violated the terms of Penal Law § 70.20(a), which requires a court imposing an indeterminate sentence to 'commit the defendant to the custody of the state department of corrections,'" was not cognizable on habeas review). Here, Petitioner has not demonstrated that she has an enforceable liberty interest in participating in the Shock program, nor has she established that her inability to participate in Shock created an "atypical and significant hardship." *See Klos v. Haskell*, 48 F.3d 81, 89 (2d Dept. 1981); *see also* N.Y. Correct. Law § 867.2. Thus, Petitioner's Due Process claim is meritless.

§ 2253(c)(2).  Here, the Court finds "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"[17]  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).  Accordingly, the Court grants *in forma pauperis* solely for the purposes of an appeal as to the erroneous adverse inference charge issue.

The Clerk of the Court is respectfully directed to mail a copy of this Order to petitioner and to close the case.

**SO ORDERED.**

Dated:  March 31, 2021
        Central Islip, New York

                                        /s/ Gary R. Brown
                                       GARY R. BROWN
                                       UNITED STATES DISTRICT JUDGE

---

[17] "This threshold question should be decided without 'full consideration of the factual or legal bases adduced in support of the claims.'"  *Buck v. Davis*, 137 S. Ct. 759, 773 (U.S. 2017) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)).  "Obtaining a certificate of appealability 'does not require a showing that the appeal will succeed,' and '[courts] should not decline the application ... merely because [they] believe[] the applicant will not demonstrate an entitlement to relief."  *Welch v. United States*, 136 S. Ct. 1257, 1263–64 (U.S. 2016) (quoting *Miller-El*, 537 U.S. at 337).  Furthermore, the Court may still issue a certificate of appealability even if "every jurist of reason might agree, after the [certificate of appealability] has been granted and the case has received full consideration, that petitioner will not prevail."  *Buck*, 137 S. Ct. at 774 (quoting *Miller-El*, 537 U.S. at 338); *see also Hunt v. Artus*, No. 16-CV-4665, 2020 WL 7643128 at *7-8 (E.D.N.Y. Dec. 23, 2020).